## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| MARK JENKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:25-cv-00676-RAH |
| | ) | |
| JOHN Q. HAMM, | ) | |
| Commissioner, Alabama | ) | |
| Department of Corrections, | ) | |
| | ) | |
| TERRY RAYBON, Warden, | ) | |
| Holman Correctional Facility, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JOHN DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO DISMISS

Steve Marshall
*Attorney General*

Polly S. Kenny
*Assistant Attorney General*

Lauren A. Simpson
*Deputy Attorney General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
Lauren.Simpson@AlabamaAG.gov

October 3, 2025

TABLE OF CONTENTS

INTRODUCTION.................................................................................1

STANDARDS OF REVIEW ..................................................................5

PRISON LITIGATION REFORM ACT....................................................6

BACKGROUND ................................................................................7

    I.    Jenkins's crime, litigation, and election of nitrogen hypoxia. ..............7

    II.    Adoption of nitrogen hypoxia and subsequent litigation...................11

        A.    Kenneth Smith................................................................12

        B.    Alan Miller....................................................................12

        C.    Carey Grayson................................................................14

        D.    Demetrius Frazier............................................................15

        E.    Gregory Hunt .................................................................16

        F.    Geoffrey West.................................................................17

        G.    Jessie Hoffman (Louisiana) ..............................................17

ARGUMENT ....................................................................................18

    I.    Count I (Eighth Amendment) and Count II (as-applied challenge) should be dismissed for failure to state a claim. ..............18

        A.    Law of method-of-execution claims. ........................................19

        B.    Jenkins does not plausibly allege a substantial risk of severe pain in Count I. .............................................22

        C.    Jenkins does not plausibly allege a substantial risk of severe pain in Count II.............................................25

D.    Defects of Jenkins's alternative methods of execution cause Counts I and II to fail as a matter of law. .......................32

II.    Count III (Sixth Amendment) should be dismissed for failure to state a claim. .......................................................................37

III.    Count IV (First Amendment) and Count V (RLUIPA) should be dismissed for failure to state a claim..................................................39

A.    Free Exercise claims. .................................................................40

B.    RLUIPA claims........................................................................42

C.    Counts IV and V are due to be dismissed.................................44

IV.    Count VI (Due Process) should be dismissed for failure to state a claim. ......................................................................................47

CONCLUSION.............................................................................................49

CERTIFICATE OF SERVICE.............................................................................51

INTRODUCTION

Mark Allen Jenkins was sentenced to death in March 1991 after he was convicted of the murder of Tammy Hogeland. *Jenkins v. State*, 972 So. 2d 111, 119 (Ala. Crim. App. 2004). His conventional appeals were exhausted in May 2021 when the United States Supreme Court denied certiorari in his federal habeas proceedings.

On June 28, 2018, Jenkins timely elected nitrogen hypoxia as his method of execution. The Alabama Department of Corrections (ADOC) did not announce a nitrogen hypoxia execution protocol until late August 2023; the present 42 U.S.C. § 1983 complaint, filed on August 22, 2025, came in just prior to the end of the two-year statute of limitations period for personal injury actions. *See* ALA. CODE § 6-2-38. Another seven of Jenkins's fellow death row inmates filed § 1983 complaints in the Middle District of Alabama on the same day, alleging similar grounds for relief; one chose to file in state court.

As of this filing, ADOC has carried out six executions by hypoxia: Kenneth Smith, Alan Miller, and Carey Grayson in 2024, and Demetrius Frazier, Gregory Hunt, and Geoffrey West in 2025. A seventh execution, Anthony Boyd, is scheduled for October. Louisiana executed Jessie Hoffman using this method in 2025. The method of execution is fairly simple. The condemned, wearing a full-face respirator and restrained to a gurney, starts by breathing a mix of gases known as "breathing air" that resembles the ordinary atmosphere. To begin the execution, the breathing

1

air is shut off and replaced by nitrogen, and within seconds, the oxygen level within the mask plummets to the point that the condemned loses consciousness and eventually succumbs. Defendants maintain, based upon the best-available science and evidence, that hypoxia is a quick and painless method of execution, and that the reported movements and "gasping" of the condemned, *see, e.g.*, DE1 ¶37, are merely unconscious movements and agonal breathing, respectively—expected and not indicative of pain or consciousness. Indeed, for well over a year now, inmates (and their experts) have pointed to Smith's so-called writhing and struggling to support claims of cruel and unusual "conscious suffocation." They have claimed that nitrogen hypoxia causes unconstitutional emotional distress. And they have pointed to dicta in *Baze v. Rees*, 553 U.S. 35 (2008), to suggest the United States Supreme Court has already decided the issue. But those claims have resoundingly failed in federal court, including in appeals to two different courts of appeals and in the Supreme Court.

Jenkins argues six claims for relief:

- Nitrogen hypoxia is cruel and unusual under the Eighth and Fourteenth Amendments, DE1 ¶¶82–89,

- Nitrogen hypoxia is cruel and unusual as applied to Jenkins, *id.* ¶¶90–95,

- The protocol denies Jenkins the Sixth Amendment right of access to counsel because counsel are not permitted in the execution chamber, *id.* ¶¶96–100,

- The protocol violates Jenkins's First Amendment right to free exercise of

religion because he will not be able to pray audibly for fear of dislodging the mask and because his spiritual advisor must stand several feet away or might decline to participate for safety reasons, *id.* ¶¶101–08,

- The protocol violates Jenkins's rights under RLUIPA for the same reasons, *id.* ¶¶109–15, and

- Jenkins's due process rights have been violated because he has not been given "sufficient details" about the protocol, *id.* ¶¶116–20.

He asks the Court to declare the protocol unconstitutional, facially and as applied to him, to enjoin Defendants from executing him via nitrogen hypoxia using the current protocol, and to grant him attorney's fees. *Id.* ¶¶ 122–25.

Jenkins's complaint is due to be dismissed. ***First***, Jenkins's Eighth Amendment claim is largely built on media accounts, *see id.* ¶¶38–58, which Chief Judge Marks deemed "unreliable evidence" in another hypoxia § 1983 action, *Frazier v. Hamm*, 2:24-cv-00732, 2025 WL 361172, at *11 n.19 (M.D. Ala. Jan. 31, 2025). The State has ample penological reason to reject his alternatives—either an overhaul of the present protocol or the firing squad. ***Second***, Jenkins's as-applied challenge consists of hypotheticals premised on the claim that he "will almost certainly suffer a panic attack" during his execution, and that the mask will worsen his symptoms: "potential shaking, crying, dry heaving, vomiting, and asphyxiation." DE1 ¶¶92–93. While Jenkins claims that his alternatives would ameliorate against this possibility, *id.* ¶94, his alternatives are neither readily available nor significantly safer than the hypoxia protocol, nor does he offer any indication of how execution by firing squad

3

would eliminate his risk of a panic attack. **Third**, as to his Sixth Amendment claim, an inmate "has no constitutionally protected interest in having counsel present throughout his execution." *Mills v. Hamm*, 102 F.4th 1245, 1250 (11th Cir. 2024). **Fourth** and **fifth**, as to Jenkins's free exercise and RLUIPA claims, while the spiritual advisor agrees to remain three feet away from the mask while nitrogen is flowing, he may still touch and minister to the inmate, including praying with him. Jenkins's contention that the risk of being close to nitrogen might prevent his spiritual advisor from being present, DE1 ¶106, is purely speculative; and to date, this problem has not arisen for any inmate executed via nitrogen hypoxia.[1] Jenkins's allegation that his prayers may not be audible due to the mask, *id.* ¶111, is again speculative, and even if there were a plausible risk that he could dislodge a full-face respirator merely by praying, *see id.* ¶112, the protocol provides for a final inspection of

---

1. For example, Kenneth Smith's spiritual advisor was Rev. Jeff Hood, who approached Smith, prayed with him, and performed last rites before the nitrogen began to flow. *E.g.*, Ralph Chapoco, *Kenneth Eugene Smith Executed by Nitrogen Gas for 1988 Murder-for-Hire Scheme*, ALA. REFLECTOR (Jan. 25, 2024, 9:28 PM), https://alabamareflector.com/2024/01/25/kenneth-eugene-smith-executed-by-nitrogen-gas-for-1988-murder-for-hire-scheme; Marty Roney, *Nitrogen Gas Execution: Kenneth Smith Convulses for Four Minutes in Alabama Death Chamber*, MONTGOMERY ADVERTISER (Jan. 25, 2024, 9:57 PM), https://www.montgomeryadvertiser.com/story/news/local/alabama/2024/01/25/four-minutes-of-convulsions-kenneth-smith-executed-with-nitrogen-gas/72358038007.

    Alan Miller's chosen spiritual advisor was Dr. John Muench, a physician. Carey Grason tapped two of his attorneys, Kacey Keeton and Matt Schulz. Demetrius Frazier and Gregory Hunt did not request spiritual advisors. Geoffrey West's spiritual advisor was Father Patrick Madden, a Catholic priest.

the mask prior to the activation of the nitrogen system. ***Sixth***, as to Jenkins's due process claim, "the Eleventh Circuit has held that death row inmates do not have a due process right to disclosure of a state's execution protocol because there is no cognizable liberty interest in such information." *Woods v. Dunn*, 2:20-cv-58, 2020 WL 1015763, at *12 (M.D. Ala. Mar. 2, 2020) (citing *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1293 (11th Cir. 2016); *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1267 (11th Cir. 2014)). For the reasons that follow, this Court should dismiss the complaint.

## STANDARDS OF REVIEW

A Rule 12(b)(6) motion tests the complaint against Rule 8's requirement of a statement "showing that the pleader is entitled to relief," as defined by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007). A court accepts only well-pleaded facts as true and is not bound by a plaintiff's legal assertions. *Iqbal*, 556 U.S. at 678. A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* The complaint must plead "factual content" sufficient "to draw the reasonable inference that [each] defendant is liable." *Id.* Allegations must be more than "speculative," *Twombly*, 550 U.S. at 555, and raise "more than a sheer possibility" of unlawful action, *Iqbal*, 556 U.S. at 678. There is a "line between possibility and plausibility," and "facts that are merely consistent with a defendant's

liability…stop[] short." *Id.* (citation modified).

## PRISON LITIGATION REFORM ACT

Jenkins seeks prospective injunctive relief in the form of an order enjoining Defendants from executing him using the nitrogen hypoxia protocol. DE1 ¶¶123–24. The Prison Litigation Reform Act (PLRA) requires that any grant of injunctive relief be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means to correct that harm." 18 U.S.C. § 3626(a) (2024). Should it grant injunctive relief, a district court is required to perform this narrowness-necessity-and-non-intrusiveness analysis as to each separate form or basis of injunctive relief and explain its findings. *See Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1279 (11th Cir. 2020) ("[For] 15 separate forms of relief, the court must make—and explain—15 separate PLRA-related findings.").

The Supreme Court has identified the PLRA's "substantive and procedural limitations" as tools "to streamline 1983 actions and protect 'the timely enforcement of a sentence.'" *Nance v. Ward*, 597 U.S. 159, 174 (2022). The PLRA underscores that this Court must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system" that would be caused by granting Jenkins the prospective relief he requests. 18 U.S.C. § 3626 (2024).

6

BACKGROUND

## I.    Jenkins's crime, litigation, and election of nitrogen hypoxia.

The following is taken from the Eleventh Circuit's recitation of the facts of Jenkins's crime. *Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1255–58 (11th Cir. 2020).

Tammy Hogeland was a young mother taking college classes and working at the Riverchase Omelet Shoppe in Hoover. On the night of April 17, 1989, her sister Wendy picked up her from class and drove her to work a little after 9:30 p.m. Hogeland was then sent to the Airport Omelet Shoppe in Birmingham after 10 p.m., as that location was shorthanded. She and Sarah Harris were the only employees on duty that night.

Meanwhile, Mark Jenkins was at the home of his friend Christine Nicholas, whom he had met at the Riverchase Omelet Shoppe, where she worked. Heavily intoxicated, Jenkins tried to seduce Nicholas, who resisted, angering Jenkins; he asked her "what she would do if someone came up from behind her and grabbed her." Around 1 a.m. on April 18, Jenkins and Nicholas went to the Riverchase Omelet Shoppe. Jenkins, a regular, spoke with waitress Frieda Vines about the Airport Omelet Shoppe. Jenkins and Nicholas then returned to her home, and around 2 a.m., Nicholas's mother asked Jenkins to leave. "He did so, falling down some steps and ramming his car into another vehicle in the process."

Around 2 a.m. at the Airport Omelet Shoppe, Harris saw Jenkins drive up in a red sports car—later identified as a Mazda RX-7 stolen from the service station where Jenkins worked—and almost crash through the glass wall of the restaurant. Jenkins came inside, apparently intoxicated, and began talking to Hogeland. Harris saw them drive away together, and though she could not say whether Hogeland went willingly, Hogeland left behind her purse, cigarettes and lighter, and paycheck.

Around 5 a.m., Jenkins stopped at a Chevron on I-59 northeast of Birmingham. He approached Bobby Coe, who was pumping gas, and asked for cigarettes and directions to I-459. Bobby and his wife, Geraldine, noticed a woman in the front passenger seat of Jenkins's red sports car, but they could not say whether she was passed out or dead. The Coes and Jenkins returned to the interstate, and between mile markers 151 and 152 in St. Clair County, Jenkins slowed and pulled off the road.[2]

Wendy Hogeland realized that her sister was not at the restaurant at 8 a.m., and their mother called the police. Meanwhile, Jenkins went to the home of his friend Steve Musser and said his car had been stolen. Musser refused to give him an alibi for the previous night and noticed that Jenkins was wearing the previous day's clothes. Nicholas also saw Jenkins that morning, looking at a newspaper in a grocery

---

2. For orientation, Jenkins pulled off the road between the Argo exit (148) and the Springville exit (156).

store, making a phone call, and trying to sell his Buick. At ten a.m., Jenkins sold his Buick to a local mechanic, explaining "that he needed the money so he could visit his sick mother in California." He left town on a Greyhound bus, but he was ejected from the bus in Houston the next day (April 19) when his fare was used up. Jenkins then hitchhiked to Los Angeles.

A police officer in Hoover—another regular at the Riverchase Omelet Shoppe—identified Jenkins as a person of interest in Hogeland's disappearance, as he knew both individuals. The red Mazda was discovered abandoned on I-459. And then, on the afternoon of April 21, a truck driver who'd pulled off I-59 found Hogeland's body on the side of the road, naked and so decomposed that she was identified by dental records. Her broken hyoid bone indicated that she had been strangled. While some of her jewelry was missing, left with her body were her clothes, her hair net, beer cans, the Mazda's manual, and other items that had come from the stolen car.

Jenkins was arrested on May 1 in Wilmington, California. Hair and fiber evidence connected Hogeland and Jenkins to the Mazda and each other, and a business card from the Mazda's glove box was found in Jenkins's wallet. Jenkins's cellmate "reported that Jenkins told him 'he had done the crime' and was worried that the couple from the gas station would identify him or that the police would find his fingerprint on a beer can at the scene."

9

Jenkins was indicted for capital murder in St. Clair County and went to trial in 1991. He was convicted, and by a 10–2 vote, the jury recommended death. The trial court concurred and sentenced him accordingly.

The Alabama Court of Criminal Appeals (ACCA) affirmed in 1992, *Jenkins v. State*, 627 So. 2d 1034 (Ala. Crim. App. 1992), as did the Alabama Supreme Court in 1993, *Ex parte Jenkins*, 627 So. 2d 1054 (Ala. 1993). The United States Supreme Court denied certiorari. *Jenkins v. Alabama*, 511 U.S. 1012 (1994) (mem.).

Jenkins sought state postconviction (Rule 32) relief in May 1995, which was denied. ACCA affirmed, *Jenkins v. State*, 972 So. 2d 111 (Ala. Crim. App. 2004), but the Alabama Supreme Court reversed in part and remanded for further consideration a juror misconduct claim, *Ex parte Jenkins*, 972 So. 2d 159 (Ala. 2005). ACCA affirmed on remand, *Jenkins v. State*, 972 So. 3d 165 (Ala. Crim. App. 2005), and both the Alabama Supreme Court and United States Supreme Court denied certiorari, *Ex parte Jenkins*, No. 1050972 (Ala. May 18, 2007); *Jenkins v. Alabama*, 552 U.S. 1167 (2008) (mem.).

Jenkins then filed a second Rule 32 petition in October 2008, which was denied and dismissed. ACCA affirmed, *Jenkins v. State*, 105 So. 3d 1234 (Ala. Crim. App. 2011), as did the Alabama Supreme Court, *Ex parte Jenkins*, 105 So. 3d 1250 (Ala. 2012), and the United States Supreme Court denied certiorari, *Jenkins v. Alabama*, 568 U.S. 1252 (2013) (mem.). Jenkins filed a third Rule 32 petition in 2021,

10

which remains pending in the St. Clair County Circuit Court.

In 2008, Jenkins also initiated federal habeas proceedings in the Northern District of Alabama. His petition was denied in 2016, *Jenkins v. Allen*, 4:08-cv-00869, 2016 WL 4540920 (N.D. Ala. Aug. 31, 2016), and the Eleventh Circuit affirmed, *Jenkins*, 963 F.3d 1248. Again, the Supreme Court denied certiorari. *Jenkins v. Dunn*, 141 S. Ct. 2635 (2021) (mem.).

In March 2018, nitrogen hypoxia was added to Alabama's statutory methods of execution, and inmates like Jenkins had a thirty-day period that June in which they could affirmatively elect the new method. *See* ALA. CODE § 15-18-82.1(b)(2). Jenkins did so on June 28, 2018.

As of this filing, the State of Alabama has not moved for Jenkins's execution to be set.

## II.    Adoption of nitrogen hypoxia and subsequent litigation.

In August 2023, ADOC adopted a protocol for carrying out judicial executions by nitrogen hypoxia. The "crux" of the protocol is that it administers "pure nitrogen gas…through an industrial respirator mask" until the inmate dies. *Grayson v. Hamm*, 2:24-cv-376, 2024 WL 4701875, at *2 (M.D. Ala. Nov. 6, 2024). EKG machines and pulse oximeters monitor the inmate's condition. *Id.*

Alabama has successfully used nitrogen hypoxia to carry out the sentences of Kenneth Smith (Supreme Court denied stay), Alan Miller (settled), Carey Grayson

(Supreme Court denied stay), Demetrius Frazier (did not appeal denial of preliminary relief), Gregory Hunt (did not challenge the method), and Geoffrey West (did not challenge the method). Louisiana used a similar hypoxia protocol to execute Jessie Hoffman (Supreme Court denied stay after Fifth Circuit vacated preliminary injunction).

### A.    Kenneth Smith

Smith elected nitrogen hypoxia but challenged the method on two grounds. First, Smith and multiple experts asserted that due to Smith's PTSD, he would vomit in the mask during the execution and then choke to death on his vomit before dying of hypoxia. *See, e.g.*, *Smith v. Hamm*, 2:23-cv-00656, 2024 WL 262867, at *1 (M.D. Ala. Jan. 24, 2024). Second, Smith and one of his experts, Dr. Philip Nitschke, asserted that ADOC's mask would not produce a tight seal. *Smith v. Hamm*, 2:23-cv-00656, 2024 WL 116303, at *18 (M.D. Ala. Jan. 10, 2024). Finding each risk highly speculative, the district court denied Smith's motion for preliminary injunction. *Id.* at *20. The Eleventh Circuit affirmed, and the Supreme Court denied certiorari. *Smith v. Comm'r*, 24-10095, 2024 WL 266027 (11th Cir. Jan. 24, 2024); *Smith v. Hamm*, 144 S. Ct. 414 (2024) (mem.). Smith was executed on January 25, 2024.

### B.    Alan Miller

The State sought Miller's execution warrant on February 21, 2024. Miller, too, challenged nitrogen hypoxia despite having elected it. Among other things, he

12

argued that "a trained medical professional" should place and hold the mask, supervise the flow of nitrogen, and respond if anything "goes awry." Complaint ¶193, *Miller v. Marshall*, 2:24-cv-197 (M.D. Ala. Mar. 29, 2024), DE1. Miller alleged that the mask would not fit his large face, that ADOC should use "medical grade nitrogen," and that a "tranquilizing medication in pill form" would "reduce thrashing." *Id.* In an order dismissing two counts but permitting Miller's Eighth Amendment claim to proceed, the district court found the surviving allegations to be "noticeably lean on factual detail" and "barely…plausible." *Miller v. Marshall*, 2:24-cv-00197, 2024 WL 2946093, at *7 (M.D. Ala. June 11, 2024).

Miller sought preliminary injunctive relief and received copious discovery. He had a team of two major law firms and Dr. Phillip Bickler, an anesthesiologist who conducts hypoxia studies to test pulse oximeters but does not take participants below seventy percent blood oxygen saturation (a far cry from the ADOC protocol). *E.g.*, Hearing Transcript at 192:5–8, *Boyd v. Hamm*, 2:25-cv-00529 (M.D. Ala. Sept. 4, 2025), DE83. Miller received access to ADOC personnel and documents and deposed nearly ten witnesses. He ultimately settled with the State and dismissed his lawsuit. *See* Joint Stipulation of Dismissal, *Miller v. Marshall*, 2:24-cv-00197 (M.D. Ala. Aug. 5, 2024), DE79. Miller was executed on September 26, 2024.

13

## C.    Carey Grayson

After the State moved for Grayson's execution, he challenged ADOC's hypoxia protocol in June 2024. *See* Complaint, *Grayson v. Hamm*, 2:24-cv-00376 (M.D. Ala. June 28, 2024), DE1. Grayson alleged that with "proper administration," nitrogen hypoxia would cause an inmate to "lose consciousness within seconds" and die within "minutes" without any "pain or discomfort." *Id.* ¶101. But ADOC's protocol would result in "unconstitutional pain," he claimed, because (1) the inmate would not be rendered unconscious prior to the administration of nitrogen gas, causing "anguish," *id.* ¶¶105, 111; (2) excess oxygen might enter the mask and prolong the execution, *id.* ¶119; (3) the protocol does not call for a medical examination to diagnose issues like sleep apnea that could prolong the execution, *id.* ¶125; and (4) the execution team is unqualified to monitor the pulse oximeters and EKGs used during the execution, *id.* ¶¶128, 129. Grayson later amended his complaint, alleging that Smith's autopsy suggested negative pressure pulmonary edema (NPPE). Amended Complaint, *Grayson v. Hamm*, 2:24-cv-376 (M.D. Ala. Aug. 30, 2024), DE42.

Grayson moved for a preliminary injunction and received limited expedited discovery. Motion for Preliminary Injunction, *Grayson v. Hamm*, 2:24-cv-00376 (M.D. Ala. Aug. 20, 2024), DE30; Order, *Grayson v. Hamm*, 2:24-cv-00376 (M.D. Ala. Sept. 18, 2024), DE62. The district court held a comprehensive two-day hearing

on Grayson's motion. The court received over fifty exhibits, including numerous case reports and articles on inert gas asphyxiation and media reports describing the Smith and Miller executions. *Grayson*, 2024 WL 4701875, at *3. The court heard live testimony from ten witnesses, including each side's expert, the medical examiner who conducted Smith's autopsy, and multiple State employees who witnessed the Smith and/or Miller executions. *Id.* at *4–6. The court denied Grayson's motion for a preliminary injunction, finding that his claim fell "well short" of the Eighth Amendment standard; Grayson presented "a speculative parade of highly unlikely events," *id.* at *19, and the State's expert, Dr. Joseph Antognini, was deemed "more credible and persuasive" than Grayson's expert Dr. Brian McAlary, *id.* at *22. The Eleventh Circuit affirmed unanimously in a published opinion, *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894 (11th Cir. 2024), the Supreme Court denied certiorari, *Grayson v. Hamm*, 145 S. Ct. 586 (2024) (mem.), and Grayson was executed on November 21, 2024.

### D.    Demetrius Frazier

Like Grayson, Frazier waited until the State moved for his execution to challenge the hypoxia protocol in November 2024. Complaint, *Frazier v. Hamm*, 2:24-cv-732 (M.D. Ala. Nov. 15, 2024), DE1. His complaint relied heavily on allegations of what lay witnesses reported about the executions of Smith and Miller. Other than his alternative methods, his complaint was substantially similar to Grayson's.

15

The district court held a hearing on Frazier's motion for preliminary injunction in January 2025, at which the court heard testimony from Dr. McAlary, Dr. Antognini, and Commissioner Hamm. The court denied Frazier's motion for preliminary injunction, finding the lay witness accounts "insufficiently reliable," *Frazier v. Hamm*, 2:24-cv-00732, 2025 WL 361172, at *11 (M.D. Ala. Jan. 31, 2025) (crediting Dr. Antognini over Dr. McAlary); *id.* at *11 n.20 (noting that "the State present[ed] credible evidence that Smith held his breath during his execution, thereby prolonging it"); and ultimately finding:

> On this record, Frazier has not established that the Protocol very likely causes needless psychological suffering, superadds psychological pain, or creates a substantial risk of serious psychological harm. While the Court does not doubt that Frazier likely will experience some psychological pain before and during his execution, the Court finds that Frazier has failed to meet his burden to show that the Protocol creates a substantial risk of serious psychological harm over and above what is inherent in any execution. Consequently, Frazier fails to establish a substantial likelihood of success on the merits of his Eighth Amendment claim.

*Id.* at *12. Frazier did not appeal, and he was executed on February 6, 2025.

### E.    Gregory Hunt

Gregory Hunt timely elected nitrogen hypoxia, and the State moved to authorize his execution in March 2025. Hunt never challenged hypoxia; he instead filed two "pro se" successive Rule 32 petitions in state circuit court and a stay application in the United States Supreme Court, which was denied. *Hunt v. Alabama*, No. 24A1192 (U.S. June 10, 2025) (mem.). Hunt was executed on June 10, 2025.

### F.    Geoffrey West

Geoffrey West timely elected nitrogen, and the State moved to authorize his execution in April 2025. He never challenged hypoxia, instead limiting his litigation to claims in response to the State's execution motion that Rule 8(d)(1) of the Alabama Rules of Appellate Procedure was unconstitutional and that the Attorney General had no role in the execution authorization process. West was executed on September 25, 2025.

### G.    Jessie Hoffman (Louisiana)

Finding that no drug company would sell Louisiana the necessary drugs for lethal injection, that state made nitrogen hypoxia its method of execution in spring 2024. Jessie Hoffman waited until February 2025, after Louisiana issued a death warrant, to bring a new lawsuit challenging nitrogen hypoxia. The parties engaged in expedited discovery, and the district court held an evidentiary hearing, featuring testimony from Dr. Antognini and Dr. Bickler. The district court found that "nitrogen hypoxia does not produce physical pain" and that a person breathing nitrogen would "lose consciousness in less than one minute." *Hoffman v. Westcott*, 3:25-cv-00169, 2025 WL 763945, at *8 (M.D. La. Mar. 11, 2025). The court enjoined Hoffman's execution, however, on its "common sense [belief] that the deprivation of oxygen to the lungs causes a primal urge to breathe and feelings of intense terror." *Id.* at *9. That alleged "psychological pain," which the court never compared to the

17

baseline emotional distress of facing execution or the distress posed by any alternatives, was enough to find that Hoffman had "clearly shown" a "substantial likelihood of success on his Eighth Amendment claim. *Id.* at *10.

The Fifth Circuit swiftly reversed, explaining that the preliminary injunction was "not just wrong" but got "the Constitution backwards, because it's premised on the odd notion that the Eighth Amendment somehow requires Louisiana to use an admittedly *more* painful method of execution." *Hoffman v. Westcott*, 131 F.4th 332 (5th Cir. 2025). The Supreme Court denied Hoffman's stay application. *Hoffman v. Westcott*, 145 S. Ct. 797 (2025) (mem.). Hoffman was executed on March 18, 2025.

ARGUMENT

Jenkins's complaint names two defendants—ADOC Commissioner John Q. Hamm and Warden Terry Raybon—as well as ten John Does, either ADOC employees or contracted personnel who assist in executions. As to all defendants, Jenkins fails to state a claim for which relief may be granted.

## I.    Count I (Eighth Amendment) and Count II (as-applied challenge) should be dismissed for failure to state a claim.

In Count I (DE1 ¶¶82–89), Jenkins contends that ADOC's nitrogen hypoxia execution protocol is "arbitrary, cruel, and/or unreliable," *id.* ¶86, "has a foreseeable and significant risk of causing Jenkins…excruciating and unnecessary pain," *id.*, and "is likely to cause the painful sensation of suffocation, and potentially other complications such as seizures, stroke, vomiting, or choking on bodily fluids," *id.* ¶87,

which will cause superadded pain. His basis for this alleged risk of superadded pain is the first five hypoxia executions. *Id.* Jenkins names two alternatives: a long list of amendments to the current protocol, *id.* ¶78, or the firing squad, *id.* ¶79.

In Count II (DE ¶¶90–95), Jenkins claims that the protocol is unconstitutional as applied to him because he suffers from PTSD and panic attacks.

Jenkins has failed to state an Eighth Amendment claim, and Counts I and II should be dismissed.

**A.    Law of method-of-execution claims.**

The Eighth Amendment forbids "cruel and unusual punishments," such as "burning at the stake, crucifixion. breaking on the wheel, or the like." *In re Kemmler*, 136 U.S. 436, 446 (1890). A claim that a method falls in that category must meet an "extremely demanding standard," *Smith*, 144 S. Ct. at 416 (Kagan, J., dissenting), an "exceedingly high bar" that no method-of-execution claim has ever surpassed in the Supreme Court, *Barr v. Lee*, 591 U.S. 979, 980 (2020); *accord Glossip*, 576 U.S. at 869. The inquiry "ask[s] whether the punishment 'superadds' pain well beyond what's needed to effectuate a death sentence." *Bucklew v. Precythe*, 587 U.S. 119, 137 (2019). "States have often sought more nearly the opposite,' developing new methods, such as lethal injection, thought to be less painful and more humane than traditional methods, like hanging, that have been uniformly regarded as

constitutional for centuries." *Lee*, 591 U.S. at 980 (citation omitted); *accord Barber v. Governor of Ala.*, 73 F.4th 1306, 1318 (11th Cir. 2023).

***First***, Jenkins must plead that nitrogen hypoxia poses a "substantial risk" of "severe pain over and above death itself." *Nance*, 597 U.S. at 164. That severe pain must be "sure or very likely" to occur. *Glossip*, 576 U.S. at 877; *accord Price v. Comm'r, Ala. Dep't of Corr.*, 920 F.3d 1317, 1325-26 (11th Cir. 2019). The Constitution "does not guarantee a prisoner a painless death" or even a quick one. *Bucklew*, 587 U.S. at 132.

***Second***, Jenkins must plead "an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Glossip*, 576 U.S. at 877. A "comparative exercise" is required to "decide whether the State has cruelly 'superadded' pain to the punishment of death." *Nance*, 597 U.S. at 164. Jenkins's alternative must provide "the State a pathway forward," such as "a veritable blueprint for carrying the death sentence out." *Id.* at 169. Jenkins also must show "that the State has refused to adopt [an alternative] without a legitimate penological reason"—i.e., the State has cruelly "chosen" to "superadd[] pain to the death sentence." *Bucklew*, 587 U.S. at 134. Among reasons not to adopt an alternative protocol are inability to secure necessary drugs, the necessary involvement of individuals unable to participate in an execution due to professional ethical restrictions,

and the state's interest in selecting a method of execution that "preserv[es] the dignity of the procedure." *Id.* at 134-35 (collecting cases).

**Third**, even if Jenkins's complaint satisfies the test just discussed, he still must plausibly allege that the method was "calculated to superadd terror, pain, or disgrace." *City of Grants Pass v. Johnson*, 603 U.S. 520, 542 (2024) (citation modified).[3] To show the method "cruelly superadds pain," *Bucklew*, 587 U.S. at 133, Jenkins must plead plausible facts that would prevent "prison officials from pleading that they were 'subjectively blameless,'" *Glossip*, 576 U.S. at 877.

As was noted earlier this year in a similar challenge, Jenkins's "claim 'faces an exceedingly high bar.'" *Frazier*, 2025 WL 361172, at *9 (quoting *Barr*, 591 U.S. at 980). The opinion continued:

> Frazier's claim cannot succeed unless he establishes that the Protocol "presents a risk that is *sure or very likely* to cause serious illness and needless suffering" and also "gives rise to sufficiently *imminent* dangers." *Grayson*, 121 F.4th at 897 (emphases in original) (quoting *Price*, 920 F.3d at 1325). The Protocol must pose a "'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Glossip*, 576 U.S. at 877 (quoting *Baze* [*v. Rees*, 553 U.S. 35, 50 (2008)]). To date, the United States Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual." *Bucklew*, 587 U.S. at 133.

*Id.*

---

3. *Grants Pass* was not a method-of-execution case, but it is offered to illustrate the Supreme Court's consistent articulation of the constitutional standard.

21

**B.    Jenkins does not plausibly allege a substantial risk of severe pain in Count I.**

Jenkins contends that "[t]he psychological pain of death by nitrogen hypoxia is severe" because the inmate must breathe the nitrogen, knowing it will kill him. DE1 ¶61. He claims that this knowledge will thrust the inmate into "a state of panic and fear," *id.* ¶62, and that as the nitrogen flows and the sympathetic nervous system engages, "[t]he condemned person's heart rate will rise, they will experience the profound sensation of air hunger, and they will hyperventilate in response to lowered oxygen levels," *id.* Once the nitrogen is flowing, Jenkins claims, "the psychological effects of nitrogen hypoxia are the same as suffocation," *id.*, and citing *Baze*, he contends that "conscious suffocation during an execution violates the Eighth Amendment," *id.* ¶84. Finally, he claims that the protocol "is likely to cause the painful sensation of suffocation, and potentially other complications such as seizures, stroke, vomiting, or choking on bodily fluids." *Id.* ¶87.

Turning first to the claim of conscious suffocation, Jenkins alleges, "Depriving a conscious person of oxygen, which is what occurs under the Redacted Protocol, creates a 'constitutionally unacceptable risk of suffocation.' *Baze*, 553 U.S. at 53. *Baze* makes clear that conscious suffocation during an execution violates the Eighth Amendment. *Id.*" DE1 ¶84. Aside from the fact that Jenkins is quoting dicta from the plurality opinion of *Baze*, the method of execution at issue in *Baze* was completely different. There, the Supreme Court was discussing (and not evaluating,

because they were uncontested) the risks of pancurionium bromide, which "inhibits all muscular-skeletal movements and, by paralyzing the diaphragm, stops respiration." 553 U.S. at 44. That does not happen with nitrogen hypoxia (and Jenkins has not pleaded that it does). He never explains how the alleged source of his terror and pain—breathing, DE1 ¶61—could be anything like having one's diaphragm paralyzed. There are more or less painful ways (and even *painless* ways) that one can be deprived of oxygen while conscious, so merely observing that a method of execution involves deprivation of oxygen is not enough to state an Eighth Amendment claim. *See, e.g.*, *In re Ohio Execution Protocol Litig.*, 946 F.3d 287, 290 (6th Cir. 2019).

Jenkins mainly relies on witness accounts of movement during the previous hypoxia executions to support his allegations that the deprivation of oxygen in those executions was painful. *See* DE1¶¶38–58. But he never confronts more likely causes of movement, including voluntary resistance (in the case of Smith and Grayson) or involuntary movements associated with dying, which can be "misperceived as signs of consciousness or distress." *Baze*, 553 U.S. at 57; *accord Grayson*, 2024 WL 4701875, at \*4, 6, 17, 20 (discussing evidence of Smith's resistance, consumption of an illegal drug before his execution, holding his breath, agonal breathing after unconsciousness, that even "brain-dead patients experience movement," etc.). On motion to dismiss, the Court need not credit any of these explanations. But neither must the Court accept allegations that are not "plausible" "given more likely

23

explanations." *Iqbal*, 556 U.S. at 681. Jenkins has offered a version of events that is no more than "merely consistent," *id.* at 678, with what some (mistaken) journalists said. All of this was litigated in *Grayson v. Hamm*, a case that should not have survived motion to dismiss, either.

Jenkins's claims that he will panic, hyperventilate, and suffer from air hunger are purely speculative. *See* DE1 ¶62. Perhaps Jenkins will experience fear immediately prior to his execution—that would not be unusual, regardless of the method.[4] But he pleads no facts showing that he will experience air hunger. And to the extent that the alleged harm of "conscious suffocation," the core of Count 1, stems from an inmate's panic, Jenkins has not pleaded an alternative that would significantly reduce the risk. There is not even an allegation that the mental distress of an inmate facing death would be reduced if ADOC placed Jenkins in front of a firing squad, *see id.* ¶¶79–81, and even if Jenkins were given a sedative sufficient to render him unconscious prior to the administration of nitrogen, *id.* ¶78, that is no guarantee that he would not experience panic, with all its alleged complications, between the time he is restrained on the gurney and the time the sedative is given.

---

4. John W. Deering, executed by firing squad in Utah in 1938, agreed to have an electrocardiograph of his heart performed during the execution. His heartrate jumped from 72 to 180 during the preliminaries, and then his heart "fluttered wildly" while he made a final statement. *Slayer's Heart Triples Beat as He Faces Death*, CHI. DAILY TRIB. (Nov. 1, 1938).

24

### C.    Jenkins does not plausibly allege a substantial risk of severe pain in Count II.

Jenkins claims that the hypoxia protocol is unconstitutional as to him because of his PTSD and panic attacks. *Id.* ¶91. Allegedly, this is due to his experience of child abuse.[5] *Id.* ¶64. Jenkins states:

> In Jenkins's case, these risks are significantly heightened due to the particular forms of childhood abuse he endured and his resulting PTSD and panic disorder, which make the experience of being restrained, masked, and suffocated especially triggering. Jenkins's personal experience of extreme child abuse parallels in critical ways what he will experience under the nitrogen hypoxia protocol—strapped down, face forcibly covered, unable to breathe, and emotionally terrorized and helpless. Nitrogen hypoxia under the Redacted Protocol will be particularly horrific for Jenkins given that this method evokes the horrors he suffered as a child.

*Id.* He claims that having a mask put on his face would be a PTSD trigger, *id.* ¶67, that if he experiences a panic attack, "he will experience physical manifestations

---

5. In Rule 32, Jenkins's expert, Dr. David Lisak, said that he "(1) had suffered from emotional, psychiatric, and psychological disturbances all his life; (2) was severely depressed for much of his life; and (3) suffered post-traumatic stress symptoms throughout his life." *Jenkins v. Allen*, 4:08-cv-00869, 2015 WL 1488899, at *3 (N.D. Ala. Mar. 31, 2015). Dr. Lisak did not perform any psychological tests, but he did review Jenkins's record and interviewed several friends and family members. *Id.* These included Steven Michael Jenkins and Betty DeLavega, whose testimony the circuit court found not credible. *Jenkins*, 972 So. 2d at 140–42.

Dr. Karl Kirkland, the State's expert, also evaluated Jenkins. *Jenkins*, 2015 WL 1488899, at *3. He administered the Bach Depression Inventory Test, which showed severe depression. *Id.* at *4. Jenkins's MMPI results were invalid "'in that he answered the questions in a way that tended to over-emphasize psycho-pathology, much like he did on the Bach Depression Inventory,'" and the results did not match Jenkins's clinical presentation. *Id.*

including but not limited to potential shaking, crying, dry heaving, vomiting, and asphyxiation," *id.* ¶93.

*First*, a note on Jenkins's alleged child abuse. *See id.* ¶¶6, 11–13. While the State does not dispute that Jenkins may have had a difficult childhood, the state circuit court, which considered evidence and testimony concerning his supposed abuse during Rule 32, made "very thorough findings," *Jenkins*, 2016 WL 4540920, at *39, and deemed much of his evidence incredible. That court found:

- "After listening to the evidence presented at the hearing and observing the demeanor of the witnesses, the Court finds that the witnesses were biased, that ***they grossly exaggerated their testimony***, and that ***they were not credible***[.]" *Jenkins*, 972 So. 2d at 138 (emphasis added).

- "The record reflects that, at the time of the trial, friends and family of Jenkins were contacted by a probation officer regarding the preparation of a pre-sentence report. ***Nothing in the report indicated that Jenkins was abused to the extent alleged at the evidentiary hearing.*** Additionally, although numerous records were introduced at the hearing, there were no medical records which would corroborate the level of abuse alleged by several of Jenkins's witnesses." *Id.* at 138–39 (emphasis added).

- **Tammy Lynn Pitts**, Jenkins's cousin, was deemed incredible, *id.* at 139.

  - She claimed that Jenkins was beaten daily from infancy until age thirteen and that Jenkins's stepfather hit him more than once with a shovel, which she described as a "normal" incident. "According to the witness, Jenkins would be laid up in bed for weeks at a time due to the severity of the beatings. Ms. Pitts even testified that Jenkins would receive additional beatings during the time he was laid up recovering from previous abuse. However, Jenkins was apparently never taken to the hospital and there were no medical records reflecting injuries consistent with the alleged severity of the abuse alleged by Ms. Pitts." *Id.*

- o Pitts claimed that Jenkins had difficulty controlling his bowels, and his parents would frequently make him wear soiled clothing to school. But Jenkins's school records "noted that Jenkins suffered from a rash and gingivitis, but contained absolutely no indication that he was beaten on a regular basis." ***"[T]he Court finds it difficult to believe that school records would reflect the notice of a rash, but would be completely devoid of any indication that a child was regularly attending school in clothes soiled with feces."*** *Id.* (emphasis added).

- o Pitts claimed that Jenkins was locked in his room around the clock and was not allowed to eat dinner with the family. "This contradicted the testimony of Jenkins's brother [Michael Jenkins] who stated that Jenkins was sent to bed without dinner, 'on occasions,' because he was bad. If Ms. Pitts is to be believed, Jenkins eked a meager existence of scraps thrown to him after dinner by other members of the family." *Id.*

- o Pitts claimed to have called CPS twice during her twenty-plus years living with the family, but CPS did nothing. "The Court finds it to be unbelievable that Ms. Pitts would feel it necessary to call CPS on only two occasions when she claimed the abuse and maltreatment was a 'daily' occurrence. It is also unbelievable that child protective services would take no action." *Id.*

- o "After hearing the testimony of Ms. Pitts, weighing the interests of the witness and observing the witnesses' demeanor, the Court finds the testimony to be incredible." *Id.* at 140.

- **Michael Jenkins**, Jenkins's half brother, offered testimony that was self-contradictory, contradictory of other testimony, and incredible. *Id.*

  - o He "testified that the family moved ten or fifteen times during his youth because his father did not work very much. This conflicted with Ms. Pitts' claim that the family moved maybe four times and that the stepfather was gainfully employed." *Id.*

  - o He "stated that Jenkins would occasionally miss meals because he was sent to his room for 'being bad.' Ms. Pitts stated that Jenkins was not allowed to eat with the family and would leap up at the food thrown at him after dinner while locked in his room. Additionally, contrary to Ms. Pitts' testimony that Jenkins was locked in his room 'twenty-four

27

hours a day seven days a week,' Michael stated that Jenkins was locked in his room for 'a couple of hours or so...every time he done something." *Id.*

o  "Describing the frequency of the alleged beatings, Michael initially stated 'if it wasn't once a day, it would be every other day or every three days.' He then stated that Jenkins would get a whipping whenever he had a bowel movement in his pants and that his occurred 'once a day.' Subsequent to that, Michael described the discipline imposed stating that Jenkins 'would be sent to his room and a number of things happened,' including an *occasional* beating." *Id.*

o  "The witness's testimony was in fact, filled with apparent confusion and contradictions." *Id.*

- **Betty DeLavega**, Jenkins's second cousin, was deemed incredible and biased. *Id.* at 141.

  o  She "had only seen Jenkins on two occasions in her life," once when he visited her in Indiana at age eleven or twelve, and once when she, her husband, and their four children stayed with the Jenkins family for five months." *Id.*

  o  "Ms. DeLavega testified that Jenkins's stepfather was cruel to both Jenkins and his brother Michael, and specifically recounted an incident where she claimed that Jenkins's stepfather forced Jenkins to eat his own feces, in front of her and her family, out of his underwear with a spoon. Although claiming to be horrified at seeing this, Ms. DeLavega did nothing. She did not call the authorities and she and her four children continued to live in the Jenkins's home. Ms. DeLavega and Jenkins's brother, Michael, were the only two persons to recount that Jenkins was forced to eat his own feces with a spoon." *Id.* at 141–42.

  o  "The Court finds that Ms. DeLavega basically had no knowledge of any long-term abuse Jenkins suffered because she had only seen Jenkins on two very brief occasions in her life." *Id.* at 142.

  o  "***The Court finds it to be beyond belief that Ms. DeLavega could witness Jenkins being forced to eat his own feces with a spoon and do nothing. It is also beyond belief that she would remain in the home with her four children after witnessing such a horrifying event.*** After

28

observing Ms. DeLavega and listening to her testimony, the Court finds her to be a biased and incredible witness, giving her testimony no weight." *Id.*

- **Doris Wagoner**, Jenkins's grandmother, was also deemed "biased and incredible." *Id.*

  - ACCA noted that she stated, "Mark never had a chance. He didn't have a home life. He was badly mistreated and then he left. I was told by others—this is hearsay. I didn't see it." *Id.*

  - Per ACCA, "[h]er testimony shows that she did not witness any abuse." *Id.*

In affirming the circuit court's findings, ACCA concluded:

> The trial court made a finding after listening to and viewing all of Jenkins's witnesses that none of the witnesses was credible and that they had exaggerated the level of abuse that Jenkins had been exposed to when he was child. This was based on contradictions in the witnesses' own testimony and on the fact no medical or school records memorialized such abuse. The circuit court noted that the school records were very detailed and even referenced that Jenkins had suffered from a rash and gingivitis but the circuit court found it hard to believe that the records made no reference to any injuries that Jenkins had sustained as a child. The circuit court's ruling is supported by the testimony at the Rule 32 hearing and is consistent with the findings made by the probation officer in the presentence report. The probation officer described the level of abuse as "moderate."

*Id.* at 144.

**Second**, Jenkins's claim is built on speculation. He pleads no facts showing a history of panic attacks or whether he has received treatment for PTSD. Rather, he argues that being strapped to the gurney and having the mask placed on him "***could*** trigger early childhood memories of the soiled diapers that were forced over his face

and constrained his breathing." DE1 ¶92 (emphasis added). He claims that "[i]f and

when" he experiences a panic attack, his symptoms will include "*potential* shaking,

crying, dry heaving, vomiting, and asphyxiation." *Id.* ¶93 (emphasis added). In other

words, *if* the mask is so triggering that Jenkins experiences a panic attack, he *may*

shake, cry, and/or vomit.

Any method of execution will entail restraint, and Jenkins offers no facts

showing that he is incapable of tolerating coverings on his face. Jenkins fails to ex-

plain why nitrogen hypoxia should be more distressing for him than any other

method of execution. As was noted in a prior method-of-execution challenge:

> [T]he Eighth Amendment "does not demand the avoidance of all risk
> of pain in carrying out executions." [*Bucklew*, 587 U.S.] at 134 (quoting
> *Baze*, 553 U.S. at 47). Thus, Frazier is not guaranteed a painless death,
> in body or mind. *See id.* at 133. Consequently, the Protocol cannot be
> considered cruel and unusual simply because Frazier may experience
> psychological pain "either by accident or as an *inescapable* conse-
> quence of death." *See Baze*, 553 U.S. at 50 (emphasis added).

*Frazier*, 2025 WL 361172, at *10. In that case, Dr. Brian McAlary, one of the in-

mate's experts, agreed that "[s]ome level of psychological pain is inherent in the

[execution] process." *Id.*; *see id.* at *13 ("But every method of execution involves a

period during which the inmate experiences psychological pain because he realizes

death is imminent."). And as was noted in another method-of-execution challenge:

> Other courts have held that psychological pain or mental suffering can-
> not by itself support an Eighth Amendment claim. *In re Ohio Execution
> Protocol Litigation*, 881 F.3d 447, 450 (6th Cir. 2018) (agreeing with
> the district court's assessment that "[p]sychological pain or mental

suffering is a likely result of being sentenced to death and anticipating the execution, but that experience of psychological suffering could not by itself make a method of execution unconstitutional").

*Grayson*, 2024 WL 4701875, at *20.

Jenkins fails to explain how the hypoxia protocol is ***sure or very likely*** to trigger a panic attack, much less vomiting and asphyxiation.[6] Thus, he has failed to plead

---

6. The potential of vomiting and subsequent aspiration was a claim in the *Smith* § 1983 litigation, and a representative of ADOC testified "that the execution team would remove and clean the mask and check and clean Smith's airway if Smith vomited *before* nitrogen was introduced into the mask. She also testified that the team would not halt the execution if Smith vomited *after* nitrogen was introduced into the mask." *Smith*, 2024 WL 116303, at *19.

Moreover, Smith, like Jenkins, claimed that he might vomit due to PTSD and offered an expert witness to opine about such, but this was rejected:

> Dr. Porterfield acknowledged under questioning by defense counsel that Smith told her that he did not experience nausea during the previous execution attempt and that he did not report to her vomiting from PTSD-induced nausea since that time. No one, including Dr. Porterfield, could state with any certainty whether Smith will feel nauseous during the execution. And no one could state with any certainty the likelihood Smith will vomit during the execution, with or without the mask on, before or during the administration of nitrogen; when, where, or how much he might vomit during the execution, or any other condition or risk. Nor did any witness provide a foundation upon which any such likelihood of vomiting would be based, such as the time of Smith's last meal, whether Smith would eat a last meal, and if so, the volume of stomach contents that would exist at the time of execution. Instead, witnesses merely opined to the theoretical possibility the Protocol may lead a condemned inmate to vomit, and— by extrapolation—the complications from an episode of vomiting if the mask happened to become dislodged during the execution or was removed altogether.

*Id.*

31

that the "conditions presenting the risk" are "sure or very likely" to cause needless suffering and pose "sufficiently imminent dangers." *Baze*, 553 U.S. at 49-50.

### D. Defects of Jenkins's alternative methods of execution cause Counts I and II to fail as a matter of law.

Jenkins must plead and "prove a known and available alternative," *Glossip*, 576 U.S. at 880, that the State has "refuse[d] to adopt" despite "documented advantages," *Baze*, 553 U.S. at 52. The alternative must allow the State to carry out the sentence "relatively easily and reasonably quickly." *Bucklew,* 587 U.S. at 141. This standard is extraordinarily high. *See Barber*, 73 F.4th at 1318. A plaintiff cannot *force* States to "experiment" with new methods, *Bucklew*, 587 U.S. at 142, or adopt a method to reduce risk "slightly," *Baze*, 553 U.S. at 51. Rather, the Eighth Amendment comes into play only when the state rejects an alternative with "comparative efficacy" so "well established" that "failure to adopt it" makes officials subjectively blameworthy. *Id.* at 57; *accord Bucklew*, 587 U.S. at 142. The standard is not an invitation to toss out a hypothetical method with gaps so large that it is unclear whether or how the state would implement it, leaving room for yet another challenge. *See Bucklew*, 587 U.S. at 141-42; *Nance,* 597 U.S. at 169; *see also Hamm v. Smith*, 143 S. Ct. 1188, 1189 (2023) (Thomas, J., dissenting from denial of certiorari).

#### i. Modified hypoxia protocol.

Jenkins's first alternative is a heavily modified version of ADOC's hypoxia protocol. DE1 ¶78.

32

- Jenkins must be offered anti-nausea medication and anti-seizure medication, as well as an IV sedative "in a dose sufficient to render him unconscious." *Id.*

- A "licensed physician or other medical professional" must supervise the placement of the mask, give Jenkins the IV sedative, monitor the pulse oximeter and EKG, be allowed to remove the mask if Jenkins vomits, and pronounce time of death. *Id.*

- Jenkins must be allowed "to speak and to audibly pray" with his spiritual advisor while unmasked. He must have "an opportunity to be in close physical proximity" to his spiritual advisor, including holding hands. *Id.*

- Jenkins must be given the option of having his counsel with him in the execution chamber to observe everything. In the alternative, counsel must have access to "audio of the execution" in the viewing room. *Id.*

- The member of the execution team who places the mask on Jenkins must have "comprehensive training," "state their level of experience with the masks being used, and state the metrics that will be used to ensure the mask is 'properly placed' and passes the 'final inspection.'" *Id.*

- Once Jenkins has a copy of the unredacted protocol, there may be amendments to this list. *Id.*

This protocol is not feasible, readily available, and significantly safer than the current execution protocol, and ADOC has penological reasons not to adopt Jenkins's suggestions.

*First*, Jenkins has failed to identify a qualified medical professional willing to participate in an execution in the capacity he requires. Medical professionals who work for YesCare, ADOC's contract provider of services to inmates, do not participate in executions in accordance with the National Commission on Corrective Health Care's standards. The AMA Code of Medical Ethics prohibits physician

33

participation in execution, including to the extent that the physician "[w]ould assist, supervise, or contribute to the ability of another individual to directly cause the death of the condemned." Opinion 9.7.3, AMA CODE OF MED. ETHICS, https://code-medical-ethics.ama-assn.org/ethics-opinions/capital-punishment (last visited Sept. 19, 2025).[7]

*Second*, Jenkins does not identify what drugs should be given to him, particularly the IV sedative. Even if he had, ADOC has not attempted to execute anyone with a combination IV drug–hypoxia protocol, and there is no reason for ADOC to add one of the complicating factors of lethal injection—reliably establishing IV lines—to a non-drug execution method. Moreover, if the sedative Jenkins requests slows his breathing, it may prolong his execution. *See Bucklew*, 587 U.S. at 142 ("[A]n entirely new method" or mere "proposal for more research" presents the State with "a 'legitimate' reason for declining to switch from its current method of execution."). "[C]hoosing not to be the first to experiment with a new method of execution is a legitimate reason to reject it." *Id.* Because the Eighth Amendment "does not compel a State to adopt 'untried and untested' (and thus unusual in the constitutional

---

7. Jenkins has also failed to plead any facts showing why a medical professional would have any expertise in supervising the placement of a full-face respirator, which is not a piece of equipment used in medical practice.

sense) methods of execution," Jenkins's complaint fails to state an Eighth Amendment claim upon which relief may be granted. *Id.*[8]

***Third***, ADOC has a legitimate security interest in not permitting Jenkins's counsel to be in the execution chamber with him or to provide audio of the execution to the witness rooms, including maintaining facility security and protecting any communications among the execution team.

***Fourth***, Jenkins fails to identify what sort of "comprehensive training" would be necessary to competently secure a full-face respirator or plead facts showing that the member(s) of the execution team who currently place and adjust the mask do so improperly.

***Finally***, if Jenkins elects to have a spiritual advisor, then the spiritual advisor may audibly pray with him in the execution chamber and hold his hand, subject to the submission and approval of Jenkins's spiritual advisor plan once his execution

---

8. If anti-nausea medication, anti-seizure medication, or a mild sedative are therapeutically warranted, then Jenkins may request such from ADOC's contract medical provider. *See Grayson*, 2024 WL 4701875, at *4, 20. Moreover, if Jenkins is genuinely concerned about vomiting and aspiration, then, like Smith, he may have his last meal earlier in the day so as to ensure he does not have a full stomach at the time of execution. *See, e.g.*, Abigail Brooks, Erik Ortiz & Dasha Burns, *Alabama Inmate Kenneth Smith Put to Death in First U.S. Nitrogen Gas Execution*, NBC NEWS (Jan. 25, 2024, 9:43 PM), https://www.nbcnews.com/news/us-news/alabama-prepares-first-us-nitrogen-gas-execution-inmate-kenneth-smith-rcna135568 ("Prison officials said earlier that as a precaution to Smith's vomiting, they gave him his final meal of solid food by 10 a.m. and only clear liquids throughout the day.").

is scheduled. In the ***highly*** unlikely event that Jenkins somehow managed to unseat the full-face respirator through merely talking, the protocol provides for a final check prior to the nitrogen's engagement. DE1-1 at 17.

### ii. Firing squad.

Jenkins's second alternative is the firing squad. DE1 ¶¶79–81. In Alabama, this would require the development of a protocol, the construction of any necessary infrastructure, and training of execution personnel. But instead of providing the Court "a veritable blueprint for carrying the death sentence out," *Nance*, 597 U.S. at 169, Jenkins refers to Utah's and South Carolina's firing squad protocols and suggests they "could easily be implemented." DE1 ¶79.

Jenkins's complaint does not seriously claim that execution by firing squad would significantly reduce any risk of severe pain from nitrogen (if such risk even existed). He alleges that firing squad executions "would involve a lesser risk of pain than the significant superadded pain Jenkins will endure" under the hypoxia protocol. *Id.* ¶81. But nothing in his complaint explains how placing Jenkins in front of a line of officers with guns would reduce his alleged panic or psychological distress, especially as being restrained is allegedly a trigger for his PTSD. *See id.* ¶64. Moreover, execution by firing squad can go wrong, as the most recent such execution,

36

that of Mikal Mahdi in South Carolina, demonstrates.[9] From the complaint, there is no reason to infer that everything in a firing squad execution will work properly or that remaining conscious with one or more gunshot wounds is significantly less painful than death by nitrogen hypoxia.

## II.    Count III (Sixth Amendment) should be dismissed for failure to state a claim.

In Count III (DE1 ¶¶96–100), Jenkins claims that his Sixth Amendment right to counsel will be violated during his execution because his counsel will not be in the chamber with him, because audio of the execution will not be delivered to the witness room, and because his counsel will not be able to watch the mask be placed on him.

As the Eleventh Circuit explained in the case of another Alabama inmate who claimed that restraining him on a gurney prior to his execution would violate his Sixth Amendment right to counsel:

> Mills is unlikely to succeed on the merits of his claim under the Sixth Amendment, which guarantees the right to assistance of counsel in all "criminal prosecutions." U.S. CONST. amend. VI. The right attaches to "all critical stages" of "criminal proceedings." *Missouri v. Frye*, 566

---

9. Dr. Jonathan Arden, a forensic pathologist, offered a report following Mahdi's execution in April 2025 and concluded that the shooters missed the target area, that Mahdi was struck by only two of three bullets allegedly fired, and that Mahdi "did experience excruciating conscious pain and suffering for about 30 to 60 seconds after he was shot." Jonathan L. Arden, Report Regarding Firing Squad Execution of Mikal Mahdi at 7–8 (May 5, 2025), *available at* https://www.scribd.com/document/859177289/Mikal-Mahdi-Arden-report.

U.S. 134, 140 (2012) (citation and internal quotation marks omitted).
Critical stages are "trial-like confrontations" between the State and the
accused. *Rothgery v. Gillespie County*, 554 U.S. 191, 212 n.16 (2008)
(citation and internal quotation marks omitted). The right to counsel
does not extend beyond the first appeal, and Mills is far past that stage.
*See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Mills is no
longer a party to a proceeding to which the Sixth Amendment extends
the right to counsel. Our sister circuit has reached the same conclusion.
*See Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017) (holding that
a claim to the right to counsel "during…execution" is "without merit"
because the Sixth Amendment right to counsel extends only to the first
appeal of right (internal quotation marks omitted)).

*Mills v. Hamm*, 102 F.4th 1245, 1249 (11th Cir. 2024) (citations edited). The Eleventh Circuit further found that Mills was unlikely to succeed on a due process claim for access to counsel during his execution, as he had "no constitutionally protected interest in having counsel present throughout his execution." *Id.* at 1250; *see also Whitaker*, 862 F.3d at 501 ("The plaintiffs point to the possibility of 'botched executions' that access to counsel could address, but that is just the kind of 'isolated mishap' that is not cognizable via a method-of-execution claim. *See Baze*, 553 U.S. at 50.").

Like Mills before him, Jenkins will not be a party to a proceeding to which the Sixth Amendment right to counsel attaches once his execution commences. Moreover, to the extent that Jenkins claims his counsel must be able to view the placement of his mask, he has failed to plead any facts showing that his attorneys have any particular expertise in full-face respirators, or even any greater expertise than the trained members of the execution team. In addition, ADOC has a legitimate

38

security interest in not permitting Jenkins's counsel to be in the execution chamber with him or to provide audio of the execution to the witness rooms, including maintaining facility security and protecting any communications among the execution team. As such, this claim is due to be dismissed.

### III.    Count IV (First Amendment) and Count V (RLUIPA) should be dismissed for failure to state a claim.

In Count IV (DE1 ¶¶101–08), Jenkins claims that his First Amendment right to free exercise of his religion will be violated during his execution. He alleges that as a Christian, he wishes to audibly pray with his spiritual advisor during his execution, but he will be unable to do so out of fear of dislodging the mask. *Id.* ¶72. Jenkins further alleges that because his spiritual advisor must stand at least three feet away from the mask, his spiritual advisor will be unable to be "at his side in the time before his death to pray audibly with him and provide him comfort." *Id.* ¶105. Finally, Jenkins claims that "a spiritual advisor could conclude that the risk to their own personal health and safety is too great and decline to be present in the room when the condemned person is executed by nitrogen hypoxia," which might deprive him of his chosen spiritual advisor or *any* spiritual advisor. *Id.* ¶106.

In Count V (*id.* ¶¶109–15), Jenkins claims that the mask, the restriction on the spiritual advisor's placement, and the supposed risk to the spiritual advisor unduly burden his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq.*

Jenkins has failed to state a First Amendment or RLUIPA claim, and Counts IV and V should be dismissed.

## A.    Free Exercise claims.

While the First Amendment generally protects the rights to freedom of speech and free exercise of religion, that protection is not absolute. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired," *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981), and "the government need not permit all forms of speech on property that it owns and controls," *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). Rather, the government may impose reasonable time, place, or manner restrictions.

In the penal context, while inmates do not lose all of their constitutional rights upon conviction and incarceration, *Sandin v. Conner*, 515 U.S. 472, 485 (1995), their rights can be limited by reasonable regulations. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Per *Turner*, the reasonableness of a challenged regulation depends on four factors, which the Eleventh Circuit has restated as follows:

> (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the

extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an "exaggerated response" to prison concerns.

*Hakim v. Hicks*, 223 F.3d 1244, 1247–48 (11th Cir. 2000); *see Turner*, 482 U.S. at 89–91.

An inmate who claims that his free exercise rights have been violated must demonstrate that the government "has placed a substantial burden on the observation of a central religious belief or practice" without "a compelling governmental interest justif[ying] the burden." *Hernandez v. CIR*, 490 U.S. 680, 699 (1989). In other words, "an inmate must show that prison officials administered or implemented a policy or regulation, not reasonably related to any legitimate penological interest or security measure, which substantially burdens and significantly interferes with the practices of the inmate's religion or restricts his free exercise of a sincerely held religious belief." *Presley v. Scott*, 4:13-cv-02067, 2014 WL 7146837, at *16 (N.D. Ala. Dec. 15, 2014).

While strict scrutiny is applied to constitutional violations outside the penal context, the courts show greater deference to prisons in considering whether regulations violate inmates' constitutional rights. *Hakim*, 223 F.3d at 1247. The Eleventh Circuit and district courts within this Circuit continue to apply the *Turner* analysis to inmate free exercise claims. *E.g.*, *Wilkinson v. GEO Group, Inc.*, 617 F. App'x 915, 917 (11th Cir. 2015); *Johnson v. Brown*, 581 F. App'x 777, 780–81 (11th Cir.

41

2014); *Marsh v. Fla. Dep't of Corrs.*, 330 F. App'x 19, 181–82 (11th Cir. 2009) ("Free exercise of religion claims brought by prisoners, however, are analyzed under a more deferential standard, the reasonableness test articulated by the Supreme Court in *Turner*."); *Williams v. Sec'y for Dep't of Corrs.*, 131 F. App'x 682, 685 (11th Cir. 2005); *Thrasher v. Woodfin*, 2:19-cv-01007, 2020 WL 4742811, at *5–6 (N.D. Ala. July 17, 2020); *Crandle v. Singleton*, 2:17-cv-00140, 2020 WL 4044712, at *3 (S.D. Ala. June 18, 2020); *Hosey-Bey v. Williams*, 2:12-cv-00959, 2015 WL 4988388, at *6 (M.D. Ala. Aug. 19, 2015).

### B.    RLUIPA claims.

"RLUIPA prohibits imposing a 'substantial burden' on an incarcerated person's religious exercise unless that burden furthers a compelling government interest using the least restrictive means." *Sims v. Sec'y, Fla. Dep't of Corr.*, 75 F.4th 1224, 1228 (11th Cir. 2023) (quoting 42 U.S.C. § 2000cc-1(a)). The law was enacted to protect inmates from the "'frivolous or arbitrary' barriers imped[ing] institutionalized persons' religious exercise," *Cutter v. Wilkinson*, 544 U.S. 709, 716 (2005), and it "provides greater religious protection than the First Amendment," *Dorman v. Aronofsky*, 36 F.4th 1306, 1313 (11th Cir. 2022).

The RLUIPA standard is stricter than the *Turner* analysis in that reviewing courts "assess whether a prison policy *as applied to an individual prisoner* is the 'least restrictive means' of furthering a 'compelling governmental interest.'"

*Rodriguez v. Burnside*, 38 F.4th 1324, 1332 (11th Cir. 2022); *see id.* at 1333 ("*Turner* makes no comparable, individualized demands. It only requires a prison's policy to be rationally related to a legitimate government interest."). Thus, "[i]f a claim fails under the RLUIPA—which embeds a heightened standard for government restrictions of the free exercise of religion—it necessarily fails under the First Amendment." *Dorman*, 36 F.4th at 1313.

RLUIPA sets forth a burden-shifting framework for petitioners. 42 U.S.C. § 2000cc-1(a). First, the inmate "must show that a government rule, regulation, practice, or policy substantially burdens his exercise of religion." *Dorman*, 36 F.4th at 1313 (citing *Ramirez v. Collier*, 142 S. Ct. 1264, 1277 (2022)). If the inmate makes this showing, then the burden shifts to the government to "prov[e] that the challenged directive is the 'least restrictive means of furthering a compelling governmental interest.'" *Id.* (citing *Ramirez*, 142 S. Ct. at 1277).

As to the inmate's burden, the question under RLUIPA is not whether he can "engage in other forms of religious exercise," but rather "whether the government has substantially burdened religious exercise." *Id.* at 1314 (quoting *Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015). The Eleventh Circuit has held that "a substantial burden is 'more than an inconvenience' and is 'akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly.'" *Id.* (quoting *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 829–

43

30 (11th Cir. 2020)) (further quotation omitted). For example, in *Holt v. Hobbs*, 574 U.S. 352 (2015), the Supreme Court found a substantial burden where an inmate was not permitted to grow a half-inch beard for religious reasons, and if he refused to shave, he would "face serious disciplinary action."

### C.    Counts IV and V are due to be dismissed.

As RLUIPA's protections subsume the First Amendment's protections and Jenkins alleges the same three issues in each claim, the two are considered together. *See Smith v. Allen*, 502 F.3d 1255, 1264 n.5 (11th Cir. 2007) (["If a prison's regulation passes muster under RLUIPA…it will perforce satisfy the requirements of the First Amendment, since RLUIPA offers greater protection to religious exercise than the First Amendment offers.").

***First***, Jenkins claims that the mask will unduly burden his right to audibly pray and may "prevent[] him from speaking and praying, lest he face the dangerous consequences of dislodging the mask while praying." DE1 ¶112. While Defendants do not challenge that prayer is a component of Jenkins's sincerely held beliefs, Jenkins's allegations here are speculative and unsupported by the facts of the previous hypoxia executions. Smith, Miller, Grayson, and West had spiritual advisors present with them in the execution chamber, all of whom were able to pray with the inmates. For example:

- Rev. Jeff Hood recounted, "My time with Kenny [Smith] was wonderful at the end. I was able to go into, uh, the execution chamber and, uh, anoint his

44

head with oil. We consistently, uh, repeated this mantra that we have repeated the whole time, 'love and life,' trying to fill every second with love and life."[10]

- Miller's spiritual advisor, Dr. John Muench, was "by his side" and appeared to be praying when one witness believed the nitrogen began to flow.[11]

- Grayson's spiritual advisor and attorney, Kacey Keeton, stated in a declaration, "I was brought into the execution chamber. As instructed in an earlier meeting with prison officials, when I was given a signal, I stepped forward and placed my hand on Mr. Grayson's leg. We then prayed together, as we discussed prior to the execution. I then stepped back into my assigned place and the execution moved forward."[12]

- West's spiritual advisor, Father Patrick Madden, "appeared to extend a blessing to West. West gave another thumbs up and what appeared to be a grimacing smile. Madden would continue to appear to pray the rosary throughout the execution proceedings."[13]

Beyond the fact that the protocol calls for a final inspection of the mask before the nitrogen is turned on, DE1-1 at 17, in none of the previous six executions was there *any* indication that the full-face respirator was dislodged when inmates moved on the gurney (consciously or unconsciously), much less when they merely spoke. As

---

10. AL.COM, *Spiritual Advisor to Executed Inmate Kenneth Smith Discusses His Experience*, at 2:14 (YouTube, Jan. 25, 2024), https://www.youtube.com/watch?v=mZKaROFvPPM.

11. WVTM 13 NEWS, *Witnessing Alan Miller's Execution: A Firsthand Account from Alabama's Death Chamber*, at 1:13 (YouTube, Sept. 27, 2024), https://www.youtube.com/watch?v=6S5Yxf86mq0.

12. Declaration of Kacey L. Keeton ¶19, *Grayson v. Hamm*, 2:24-cv-00376 (M.D. Ala. Apr. 2, 2025), DE136-1.

13. Sarah Clifton, *Alabama Executes Geoffrey Todd West by Nitrogen Gas for 1997 Murder*, MONTGOMERY ADVERTISER (Sept. 25, 2025, 8:42 PM), https://www.montgomeryadvertiser.com/story/news/local/alabama/2025/09/25/geoffrey-todd-west-executed-for-1997-murder/86178167007.

noted above, to survive a Rule 12(b)(6) motion, allegations must be more than "spec-ulative," *Twombly*, 550 U.S. at 555, and raise "more than a sheer possibility" of unlawful action, *Iqbal*, 556 U.S. at 678. The claim that Jenkins will be unable to pray audibly with his spiritual advisor does not rise above speculation.

***Second***, Jenkins alleges that his rights will be violated because the spiritual advisor must stay three feet away from the mask for safety. DE ¶¶105, 113. Again, this is not only speculative but is also belied by the facts of the previous executions—Rev. Hood anointing Smith and praying with him, Dr. Muench standing by Miller's side, and Keeton praying with her hand on Grayson's leg. While spiritual advisors need to maintain a safe distance ***while nitrogen is flowing***, the previous executions show that they are able to minister to the inmates in the moments immediately prior.

***Third***, Jenkins's claim that he may be denied a spiritual advisor, or at least one of his choosing, *id.* ¶¶106, 113, is pure speculation. Jenkins has not identified a spiritual advisor unwilling to minister to him at his execution due to fear of nitrogen, much less that ***no*** Christian minister would be willing to stand with him. Moreover, a potential spiritual advisor might decline to participate for any reason, and Jenkins has no right to compel another person to be in the chamber with him, religious pref-erence or no. Further, if Jenkins truly would prefer a firing squad execution, his spir-itual advisor would likely not even be permitted to stand in the same ***room*** during

46

the execution due to concerns about shrapnel or ricocheting bullets. Therefore, Counts IV and V are due to be dismissed.

## IV.    Count VI (Due Process) should be dismissed for failure to state a claim.

In Count VI (DE1 ¶¶116–20), Jenkins alleges that his Fourteenth Amendment right to due process has been violated because Defendants "have not disclosed sufficient details regarding the procedures that will be utilized in carrying out Jenkins's execution, preventing him from determining all the aspects of the Redacted Protocol that may constitute cruel and unusual punishment and from consulting medical experts concerning those aspects."

To succeed on a procedural due process claim, Jenkins must show "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1293 (11th Cir. 2020). He fails out of the gate, for "the Eleventh Circuit has held that death row inmates do not have a due process right to disclosure of a state's execution protocol because there is no cognizable liberty interest in such information." *Woods v. Dunn*, 2:20-cv-58, 2020 WL 1015763, at *12 (M.D. Ala. Mar. 2, 2020) (citing *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1293 (11th Cir. 2016); *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1267 (11th Cir. 2014)); *see also Zink v. Lombardi*, 783 F.3d 1089, 1109 (8th Cir. 2015) (agreeing with Fifth and Eleventh Circuits that there is no "freestanding right to detailed

disclosure" of state's execution protocol); *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014) ("[U]ncertainty as to the method of execution is not a cognizable liberty interest."); *Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013) ("There is no violation of the Due Process Clause from the uncertainty that Louisiana has imposed on Sepulvado by withholding the details of its execution protocol.").

Moreover, Jenkins, like all death-row inmates, was provided a redacted copy of the execution protocol in late August 2023. DE1-1. The protocol is redacted for security purposes, but it explains how a nitrogen hypoxia execution will proceed:

- After a final visual inspection of the system by the Warden or Assistant Warden, breathing air will be allowed to flow to the mask.

- The condemned will be taken to the execution chamber and restrained on the gurney. A pulse oximeter will be placed on him.

- Before the mask is placed on the condemned's face, a member of the Execution Team will use an oxygen meter to ensure that breathing air (instead of pure nitrogen) is flowing into the mask. The mask will then be placed on the condemned's face, the pulse oximeter will be monitored, and the Team Captain will verify that the mask is properly seated.

- The spiritual advisor will be brought in to minister to the condemned.

- After a check to ensure there are no legal impediments to execution, the Warden will cause the curtains to the witness rooms to be opened. He will enter the chamber and read the warrant. The condemned may then make his final statement.

- The Warden will check again with the Commissioner for any stays of execution before proceeding.

- Team members will make a final inspection of the mask to ensure proper placement.

- The Warden will then activate the nitrogen hypoxia system, causing nitrogen gas (instead of breathing air) to flow into the mask. The nitrogen will be allowed to flow for fifteen minutes or five minutes after flatline on an EKG, whichever is longer.

*Id.* at 16–18. While many of the redactions as to nitrogen hypoxia concern the specifics of the equipment and how it is tested and used (e.g., the location of a sensor, *id.* at 32), the protocol reveals that there are lockout valves, pressure gauges, and a wall-mounted oxygen monitor, *id.* at 32, 35, gas cylinders with valves and pigtail connections, *id.* at 32, manifolds for breathing air and nitrogen banks, *id.* at 33–34, a warning placard, *id.* at 34, a hose, attachment straps, and tubing (in the mask assembly), *id.* at 35, and portable oxygen meters, *id.* Jenkins has pleaded no facts explaining what else he would need to know in order to challenge the protocol.

Jenkins has no right to know every detail of Alabama's hypoxia protocol where redactions are made for facility security purposes. Thus, this claim is due to be dismissed.

## CONCLUSION

For the above reasons, Jenkins's complaint is due to be dismissed. Further, Defendants oppose the declaratory, injunctive, and pecuniary relief Jenkins requested.


Respectfully submitted,

Steve Marshall

49

*Attorney General*

**/s/ *Lauren A. Simpson***
Lauren A. Simpson
*Deputy Attorney General*

Polly S. Kenny
*Assistant Attorney General*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system, which will send notification of such filing to counsel of record.


           ***/s/ Lauren A. Simpson***
           Lauren A. Simpson
           *Deputy Attorney General*

ADDRESS OF COUNSEL:

Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Lauren.Simpson@AlabamaAG.gov